**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0181n.06
Filed: March 5, 2009

No. 08-5249

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| BRENDA DEATON, | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **O P I N I O N** |
| | ) | |
| **Defendant-Appellee.** | ) | |

_____

**Before: MOORE and WHITE, Circuit Judges; and VINSON,*** **District Judge.**

**C. ROGER VINSON, District Judge.** The plaintiff-appellant, Brenda Deaton, applied for

Supplemental Security Income Benefits on or about November 26, 2002. The defendant-appellee,

the Commissioner of Social Security, denied her application, the district court affirmed that decision,

and Deaton now appeals. We AFFIRM.

Deaton alleged that she became disabled on November 9, 1992, due to arthritis, high blood

pressure, diabetes, gastroesophagael reflux, carpal tunnel syndrome, fibromyalgia, heart disease,

hypothyroidism, migraine headaches, major depression, and a "bad right leg." In her application

materials, Deaton answered "yes" when asked if she could read and write more than her name. *See*

_____

* The Honorable C. Roger Vinson, United States District Judge for the Northern District of
Florida, sitting by designation.

Transcript of the Administrative Record ("Tr.") 88.[1] A hearing was held before the ALJ on April 28, 2005. Deaton testified that she was 44 years of age; she had never been married; she had owned her own home for seventeen years (which she received when her mother and her boyfriend died); she lived by herself and was able to cook for and feed herself (although her niece lived nearby and often helped); she was 5'4" and weighed approximately 195 pounds; she had a current drivers' license with no restrictions; she completed the eighth grade and never received a GED; she had no vocational training; and she was not currently employed. She testified that she had had depression for years and that it was her "most serious medical problem." Her depression caused her to cry frequently, and it led to problems sleeping, concentrating, and remembering. She took medication for her diabetes and high blood pressure, and she had arthritis, which caused pain in her feet, knees, legs, back, hands, elbows and neck. She had surgery on her right hand for carpal tunnel syndrome three years prior, and she had shown some improvement following the surgery, but she testified that "now it's getting back worse again." She was supposed to have surgery on her left hand also, but she could not afford it.

Deaton testified that she was hospitalized 25 years earlier when she attempted, or thought of attempting, suicide. With respect to her current limitations, she testified that, because of her arthritis, she could sit for approximately 15 to 20 minutes before she had to stand up or lie down to relieve the pain. She used a heating pad and over-the-counter pain creams to help with the pain (particularly in the morning). She would also get migraine headaches two to three times a week, and she had an

---

[1] On at least two other occasions during the application process Deaton stated that she was to some degree literate. *See* Tr. 98, 106 (answering yes to the questions: "Can you read and write?").

underactive thyroid, which manifested itself with tumors on both sides and a goiter. She testified to using a cane to assist in walking for the previous four years.

After the hearing, the ALJ concluded that Deaton, while suffering from a variety of ailments, had the residual functional capacity to perform a range of sedentary assembly and inspecting jobs. Based on the testimony of vocational expert ("VE") Dr. James H. Miller, the ALJ further determined that there were a significant number of such jobs in the national economy. Consequently, the ALJ denied Deaton's application for benefits. The Appeals Council declined to review the ALJ's decision, and, as noted, the decision was later affirmed by the district court.

Our review is limited to determining whether there is "substantial evidence" in the record to support the ALJ's decision and whether the ALJ applied the proper legal standards. *See, e.g., Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997); *Cutlip v. Secretary of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994). The Supreme Court has stated that substantial evidence means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). If the ALJ's decision is supported by substantial evidence, we must affirm because "the court may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Gaffney v. Bowen,* 825 F.2d 98, 100 (6th Cir. 1987); *see also Bradley v. Secretary of Health and Human Servs.*, 862 F.2d 1224, 1228 (6th Cir. 1988). "The decision of an ALJ is not subject to reversal, even if there is substantial evidence in the record that would have

supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Key, supra,* 109 F.3d at 273.

Deaton essentially raises four claims on appeal. Her first and second claims are that the ALJ improperly rejected the assessment of restrictions offered by her treating mental health source and, relatedly, that the ALJ failed to provide "good reasons" for doing so. Third, Deaton claims that VE Miller failed to carry the Commissioner's ultimate burden of proof. Finally, she claims that the ALJ mechanically applied the age categories in the Medical Vocational Guidelines.

As for her first two claims of error, Deaton argues that the ALJ erred in rejecting, without good reason, the assessment of her treating mental health source. Specifically, she contends that the ALJ erred in not accepting two assessments of Dr. Lea Hayag, who became her treating psychiatrist in or around February 2003. On November 19, 2003, Dr. Hayag had diagnosed Deaton with "Major Depressive Disorder, Single Episode, Severe, w/ Psychosis, Dysthymic Disorder." Then, on March 4, 2004, Dr. Hayag opined that Deaton had limited, but satisfactory, ability in the following areas: (i) deal with the public; (ii) use judgment; (iii) interact with supervisors; (iv) function independently; (v) understand, remember and carry out simple job instructions; (vi) maintain personal appearance; and (vii) demonstrate reliability. Dr. Hayag found her to be seriously limited, but not precluded, in other areas: (i) deal with work stresses; (ii) maintain attention and/or concentration; (iii) behave in an emotionally stable manner; and (iv) relate predictably in social situations. Deaton claims that the ALJ improperly disregarded this assessment of her treating psychiatrist, and instead relied on her own observations and interpretation of the evidence.

It is true that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. *See, e.g., Rogers v. Commissioner of Social Security,* 486 F.3d 234, 242 (6th Cir. 2007). However, this court "has consistently stated that [the Commissioner] is not bound by the treating physician's opinions, and that such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence." *Bogle v. Sullivan,* 998 F.2d 342, 347-48 (6th Cir. 1993). The appropriate question is whether the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record;" if it is well-supported, then it will be given controlling weight. *Rogers, supra,* 486 F.3d at 242 (citation omitted). If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Id.* There is an additional requirement associated with the treating physician rule: "the ALJ must provide 'good reasons' for discounting treating physicians' opinions," and the reasons must be "sufficiently specific." *Id.*

It is important to keep in mind in this context that opinions on some issues, such as whether the claimant is disabled and her residual functional capacity, "are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case, *i.e.*, that would direct the determination or decision of disability." 20 C.F.R. § 416.927(e); *accord Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir.

2004) ("The determination of disability is ultimately the prerogative of the Commissioner, not the treating physician.") (citation and brackets omitted). Thus, statements from medical sources about what a claimant can still do are relevant evidence, but they are not determinative inasmuch as the ALJ has the ultimate responsibility of determining disability and residual functional capacity.

The ALJ acknowledged Dr. Hayag's evaluation, after which she went on to discuss the report and assessment performed by Dr. Kenneth Starkey, who had evaluated Deaton at the request of the Commissioner. Dr. Starkey concluded, among other things, that Deaton had limited, but satisfactory, abilities in certain areas not assessed by Dr. Hayag (*e.g.*, her ability to follow work rules and relate to co-workers), and she was found seriously limited, but not precluded, in other areas not assessed by Dr. Hayag (*e.g.*, her ability to understand, remember, and carry out detailed instructions). After reviewing the two reports, *inter alia*, the ALJ stated:

> The claimant's allegation of symptoms related to her mental impairments are extreme and appear implausible when compared to the actual treatment record. . . . I accept Dr. Starkey's assessment of the claimant's intellectual functioning, as it is more consistent with the claimant's adaptive functioning. The claimant reported that she cared for her severely disabled mother until she was unable to do so because of physical impairments. The claimant has a long history of living independently and is able to care for her own needs. Therefore, the claimant has demonstrated the ability to function, notwithstanding her reported IQ scores.[1] I do not give Dr. Hayag's opinions controlling weight because they are not supported by the objective record.

---

[1] According to Dr. Starkey's assessment, Deaton produced a verbal IQ of 74, a performance IQ of 72, and a full scale IQ of 70, which put her in the 4th, 3rd and 2nd percentiles respectively, and at the lower range of borderline intellectual functioning (when adaptive functioning is considered). It was expected that future testing would yield a full scale IQ falling within a range of 67 to 74.

The ALJ specified why she did not give Dr. Hayag's opinion controlling weight --- because she found that it was not consistent with the objective evidence in the record. For example, despite Deaton's claims of significant deficits in daily functioning due to her mental disorders, the record clearly showed that Deaton cared for herself (and, previously, for her mother) and that she had the capacity to function in the public domain, such as in doctors' offices and in grocery stores. More specifically, Dr. Starkey reported --- and Deaton's own testimony confirmed --- that Deaton could complete activities of daily living, such as feeding, bathing, dressing, grooming, driving, toileting and transferring. She could also use small amounts of money, shop for small items, use a telephone, prepare simple meals, and manage medication. With respect to social functioning, the record also showed that Deaton possessed the capacity to interact appropriately and communicate effectively with others. It was noted that she communicated without difficulty and did not exhibit any antisocial behavior during the examinations or hearing. Further, her concentration skills allowed for the completion of assigned tasks as evidenced, among other things, by her understanding the hearing proceedings and all lines of questioning put to her.

The ALJ assessed the evidence and found that Dr. Starkey's opinion was consistent, while Dr. Hayag's opinion was inconsistent, with the record as a whole. "Generally, the more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion." 20 C.F.R. § 416.927(d)(4). The ALJ applied the proper legal standard and her determination on this point is supported by substantial evidence.

Deaton next argues that the testimony of VE Miller was deficient inasmuch as the ALJ erred in failing to specifically advise Dr. Miller of Deaton's reading deficit.[2] She contends that the denial of benefits thus "rests on sedentary assembly and inspecting jobs which require a reading ability well beyond that of the claimant." But, for each hypothetical that the ALJ posed, she asked Dr. Miller to assume an individual with Deaton's educational background, which necessarily included her limited formal education and reduced reading level. Further, Deaton has cited nothing to support the claim that the sedentary jobs for which she was found to be qualified require a reading or mental ability beyond what she possesses. The examples given by VE Miller include jobs that would not appear to require reading beyond which she is capable, such as hand assembler, small products inspector, hand packer, and bench worker. 20 C.F.R. pt. 404, subpt. P, app. 2, § 201.00(i), explains that:

> While illiteracy or the inability to communicate in English may significantly limit an individual's vocational scope, the primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people) and in these work functions at the unskilled level, literacy or ability to communicate in English has the least significance. . . . Thus, the functional capability for a full range of sedentary work represents sufficient numbers of jobs to indicate substantial vocational scope for those individuals age 18-44 *even if they are illiterate or unable to communicate in English.*

---

[2] Deaton also argues that the ALJ improperly relied on the vocational testimony "because she did not ask the VE to consider all of the restrictions which she ultimately adopted." This argument is rejected because, after review of the full testimony, we are satisfied that the five hypotheticals put to the VE accurately reflected Deaton's abilities and limitations.

Deaton's fourth and final argument is based on the following syllogism: because she turned 45 years of age within 23 days of the ALJ's decision, and because she is "functionally illiterate," the ALJ should have applied Rule 201.00(h)(1), which provides:

> [A] finding of "disabled" is warranted for individuals age 45-49 who: (i) Are restricted to sedentary work, (ii) Are unskilled or have no transferable skills, (iii) Have no past relevant work or can no longer perform past relevant work, and (iv) Are unable to communicate in English, or are able to speak and understand English but are unable to read or write in English.

20 C.F.R. pt. 404 subpt. P, app. 2 § 201.00(h)(1). We do not agree. Deaton was 44 years old at the time of the ALJ's decision; not 45. Although the regulations provide that age categories should not be applied "mechanically" in all cases, *see* 20 C.F.R. § 416.963(b), at the same time, this court has explained that the regulation "obviously does not mean that a claimant must move mechanically to the next age category whenever his chronological age is close to that category." *Crady v. Secretary of Health and Human Servs.,* 835 F.2d 617, 622 (6th Cir. 1987). Rather, a court may disregard an age category in a "borderline situation," that is, if the claimant is "'within a few days to a few months of reaching an older age category, *and* using the older age category would result in a determination or decision that [the claimant is] disabled.'" *See Bowie v. Commissioner of Social Security,* 539 F.3d 395, 397 (6th Cir. 2008) (*quoting* 20 C.F.R. § 404.1563(b)) (emphasis added). Although Deaton was within a few days of reaching 45, the application of that older age category would not result in a finding of disability, and, therefore, this is not really a borderline situation. This is because the record does not support a conclusion that she is illiterate.

The applicable regulations provide:

> Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling.

20 C.F.R. § 416.964(b)(1). Deaton attended school through the eighth grade, which constitutes a "limited education" under the regulations, *see* 20 C.F.R. § 416.964(b)(3) ("We generally consider that a 7th grade through the 11th grade level of formal education is a limited education."); she was not in special classes while in school; she did not have to repeat any grades; and she has indicated that she can read and write (albeit at a third grade level). Even if we assume that she has a "marginal education," she should still be able to perform the sedentary jobs identified by the VE. *See* 20 C.F.R. § 416.964(b)(2) ("Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education."); *see also Johnson v. Commissioner of Social Security,* 97 Fed. Appx. 539, 541 (6th Cir. 2004) (unpublished) (claimant was not illiterate because, even though he testified that he could not read or write, he went to school to the sixth grade, he could purchase items, and he could make proper change; consequently, "substantial evidence supports the administrative law judge's conclusion that Johnson has a marginal education and is not illiterate").

Citing *Skinner v. Secretary of Health and Human Servs.*, 902 F.2d 447 (6th Cir. 1990), Deaton argues that this court has recognized that a third-grade reading level provides evidence to support a finding of "functional illiteracy." However, *Skinner* differs in a number of significant respects. The claimant in that case testified at the administrative hearing that he only completed the third grade (in

a one-room schoolhouse in rural Mississippi); he was unable to read a newspaper; and the evidence showed that he read "*below* the third grade level." *See id.* at 448-99 (emphasis added). Despite this "unambiguous" and "undisputed" evidence, the ALJ determined that he had a marginal education. In reversing, this court stated that there was "overwhelming evidence" in the record that Skinner was, in fact, illiterate. *See id.* at 450 ("The record is replete with evidence that Mr. Skinner is illiterate" because his test results "indicate that he reads *below* the third grade level") (emphasis added). Here, by contrast, it appears to be undisputed that Deaton completed the eighth grade and at the very least reads at (not below) a third grade level. Unlike the claimant in *Skinner*, there is no evidence here that Deaton "cannot read or write a simple message such as instructions or inventory lists." 20 C.F.R. § 416.964(b)(1). To the contrary, she herself stated several times in her application materials that she can read and write. *See, e.g.,* Tr. 88, 98, 106. *Skinner* is not controlling here.

Accordingly, the district court's order is AFFIRMED.